## In re NEW HAMPSHIRE ELECTRIC COOPERATIVE, INC., Debtor.

### Bankruptcy No. 91–11336.

United States Bankruptcy Court,
D. New Hampshire.

Aug. 20, 1991.

E. Franklin Childress, Jr., U.S. Trustee, Boston, Mass.

George J. Marcus, Gerald M. Amero, Valerie S. Libby, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Maine, for Creditors' Committee.

Mark W. Vaughn, Frederick J. Coolbroth, Devine, Millimet & Branch, P.A., Manchester, N.H., Harold T. Judd, Asst. Atty. Gen., Office of the Atty. Gen., Concord, N.H., Audrey A. Zibelman, Gen. Counsel, New Hampshire Public Utilities Commission, Concord, N.H., for State of New Hampshire.

Thomas D. Rath, Rath, Young, Pignatelli and Oyer, P.A., Concord, N.H., John B. Nolan, Jeffry G. Grody, Carole J. Mack, Day, Berry & Howard, Hartford, Conn., Pierre O. Caron, Asst. Gen. Counsel, Public Service Company of New Hampshire, Manchester, N.H., for NU/PSNH.

James G. Bruen, Jr., Lacy R. Harwell, Jr., Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for REA.

John J. List, Cynthia Garegnani, The National Rural Utilities Cooperative Finance Corp., Herndon, Va., Wilbur F. Foster, Jr., Milbank, Tweed, Hadley & McCloy, New

York City, Joseph A. Foster, McLane, Graf, Raulerson & Middleton, P.A., Manchester, N.H., for CFC.

Sheila Oliver, Drinker, Biddle & Reath, Philadelphia, Pa., for United Engineers and Constructors, Inc.

Connie L. Rakowsky, Orr and Reno, P.A., Concord, N.H., for New England Power Co.

Mary Ann Lynch, Gen. Counsel, Augusta, Maine, for Maine Yankee Atomic Power Co.

Page Brown, Brown and LaPointe, P.A., Exeter, N.H., for Lyman R. Hammond, Jr. and Faye A. Hammond.

Robert A. Olson, Paul A. Savage, Brown, Olson & Wilson, P.C., Concord, N.H., for Alexandria Power Associates, Bio Energy Corp., Bridgewater Power Co., L.P., Hemphill Power and Light Co., Pinetree Power, Inc., Pinetree Power—Tamworth, Inc., Timco, Inc. and Whitefield Power and Light Co.

Cohn, Roitman & Kelakos, Mr. Daniel C. Cohn, A. Davis Whitesell, Boston, Mass., Merrill & Broderick, Mark W. Dean, Manchester, N.H., for debtor.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

The electric utility debtor in this case filed a Motion to Change Power Supply Without Rejection of Contract and a Motion to Change Power Supply Through Rejection of Contract. A pretrial hearing was held on August 15, 1991 with respect to those motions, and some of the parties raised a number of issues regarding the propriety of deciding this issue prior to a plan being filed since it is the crux of the debtor's plan of reorganization. Upon reflection, I agree with those concerns and now put forth my reasoning in this opinion.

## FACTUAL BACKGROUND

The debtor is a non-profit consumer-owned rural electric distribution cooperative. In 1972, the debtor executed a partial requirements service agreement with Public Service Company of New Hampshire (PSNH), which governed the purchase of wholesale power from PSNH by the debtor. That agreement had the following provision which the debtor believes allows it to become a stand-alone participant in NEPOOL, an affiliation of electric utilities of New England, while also participating in the Seabrook nuclear power plant.

> [NHEC] understands that if it shall become a Participant in the New England Power Pool and acquire ownership interest in the Seabrook Nuclear units as now contemplated, [PSNH] intends to make available only a contract demand service at those delivery points where a portion of [NHEC's] power requirements is supplied from [NHEC's] entitlement in the Seabrook Nuclear units and that this Agreement would then be terminated with respect to those delivery points and replaced by an agreement or rate schedule providing for such contract demand service at such delivery points.

As a stand-alone participant, a utility could power pool with other utilities to purchase low cost power for its customers. Thus, the debtor argues, it would not have to buy wholesale power from PSNH.

The debtor and PSNH revised their 1972 agreement when the debtor purchased an interest in Seabrook. The agreement dated March 3, 1981 provided that PSNH would supply the debtor with power to satisfy needs not met by the debtor's entitlement from Seabrook and another nuclear power plant. This agreement provided that it can be terminated upon at last 5 years written notice by either party. However, it also had a provision regarding the debtor's right to become a stand-alone participant in NEPOOL. Section VI provides in pertinent part:

> Nothing in this Agreement prevents [NHEC] from becoming a participant in the New England Power Pool ("NEPOOL"), such membership to include either some or all of the [NHEC's] delivery points. [PSNH] will support [NHEC's] membership in NEPOOL if [NHEC] chooses to apply. [PSNH] will provide transmission and subtransmission services necessary to effectively integrate all

or part of [NHEC's] delivery points served by [PSNH] and covered by NEPOOL membership, so that [NHEC] may participate as a single entity in NEPOOL for all such points.

In March of 1981, the debtor and PSNH also entered into a sell-back agreement which was subsequently modified. That modified agreement arguably obligated PSNH to purchase for ten years whatever Seabrook power the debtor agreed to sell PSNH in return for a concurrent ten-year promise by the debtor to remain an all requirements wholesale power customer of PSNH for power in excess of the debtor's nuclear plant entitlement. The debtor disputes this purported return promise, particularly its linkage to the Partial Requirements Agreement of 1981.

The high cost of Seabrook power led both the debtor and PSNH into chapter 11 reorganization proceedings in this Court: PSNH in 1988 with a plan confirmed in 1990; and, NHEC in a case filed in 1991. Throughout both proceedings PSNH and NHEC have disputed between themselves the meaning of the agreements they had executed. A settlement has never been reached. Consequently, on December 7, 1990 PSNH filed with the Federal Energy Regulatory Commission (FERC) the 1981 Partial Requirements Agreement (with amendments) and sought to permit the debtor to become a stand-alone participant only after a minimum of ten years. PSNH also sought in its filing a 182 percent wholesale rate increase for power PSNH sold to the debtor.

In response, the debtor entered into a contract with New England Power Company (NEP) in January of 1991. This contract would entitle the debtor to receive wholesale power from NEP through October 31, 1996 at a considerable cost savings to the debtor. Estimates have been produced by the debtor that show for the ten-year period beginning November 1, 1991 a switch to this new contract would arguably save $136 million. This contract was executed prior to the NHEC chapter 11 filing on May 6, 1991, and is conditioned upon

approval by FERC or "another appropriate authority." This contract was filed with FERC on January 29, 1991.

Supplemental agreements between the debtor and NEP, reached after the NHEC chapter 11 filing, would have NEP subsidize up to $30 million of the debtor's ongoing maintenance, operating and construction expenses, and have NEP pay $10 million for the debtor to extend the contract two years and become an all requirements buyer.

Due to a New Hampshire Public Utilities Commission ruling, it is possible that the debtor cannot receive any sell-back revenues from PSNH for an entire power year (November 1st—October 31st) if the debtor ceases to become a PSNH partial requirements customer at any point during that power year. Therefore, the debtor wants to change power suppliers effective November 1, 1991. A rough estimate of the savings for the next year if the debtor were allowed to change suppliers by the specified date is $20 million.

The FERC suspended a hearing schedule to begin on July 22, 1991, to decide the contract disputes between the debtor and PSNH, when the debtor filed for bankruptcy court relief. The debtor has sought for this Court to make a determination of these issues, through its motions filed on June 25, 1991, with ruling requested before November 1, 1991, which apparently is a number of months before any decision by FERC could issue. PSNH has raised a question of this Court's jurisdiction to decide these matters given the presence of FERC. However, the Court finds it unnecessary to decide that question now.[1]

Debtor's first motion seeks a determination that Section VI of the 1981 Partial Requirements Agreement allows the debtor to become a stand-alone participant in NEPOOL, and that the debtor can either assume or be allowed to enter into the NEP agreements. Debtor's second motion, in the nature of an alternative request for relief, seeks to reject the Partial Requirements Agreement as burdensome and to

---

1. This issue can be raised at confirmation, as I discuss *infra*.

either assume or be allowed to enter into the NEP agreements. For the reasons stated below both motions must be denied.

### DISCUSSION

The primary problem with these motions is that they obviate the protection that Congress gave to creditors in Chapter 11 cases when they enacted the Bankruptcy Code in 1978 and provided the debtor control of the reorganization process, at least for the exclusivity period.

Before 1978, under the prior Bankruptcy Act, a debtor seeking corporate reorganization could not proceed with that effort in the reorganization court [under Chapter X of the Prior Act] without first obtaining after due notice and hearing by any opposing parties a determination by the Court that the debtor was insolvent and, among other required allegations in the petition, that the petition had been filed in good faith. *Bankruptcy Act*, §§ 130, 141–148. (11 U.S.C. §§ 541–549) If the petition was approved by the Court, a reorganization trustee was appointed who supplanted management in all substantial reorganization cases under the prior Act. Thereafter, the Court held a number of hearings to formulate the plan in which the Court, in effect, was the fulcrum upon which a plan of reorganization was hammered out. The plan could not go out for a vote until the Court, after various hearings and procedures, made a finding that the plan as finally formulated was "fair and equitable, and feasible", among other requirements. *Bankruptcy Act*, § 174. (11 U.S.C. §§ 621–629).

That was all eliminated in 1978 under the present Bankruptcy Code, and the quid pro quo, if you will, for putting the debtor in control of the plan formulation process during the exclusivity period was that the debtor would file a disclosure statement in great detail describing its history and problems, its financial condition, the options available to it, and the plan of reorganization that it wished to submit to a vote. *Bankruptcy Code*, § 1125. While this debtor-formulated plan could be submitted to creditors and stockholders for a vote

without prior approval of the Court, unlike the prior system, no such vote could be held until all such creditors and stockholders had received the court-approved disclosure statement.

I believe on reflection here that the proposed relief under the pending motions in effect would obviate the procedural safeguards and protection that Congress intended to have in the reorganization process once the *debtor was given the initial control* of the process. The relief requested accordingly shouldn't be effectuated here in the manner proposed.

I realize that there are cases that say that major restructuring can be considered outside of a plan context, cf. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983) but I adhere basically to what I said in *In re PSNH*, 90 B.R. 575 (Bankr.D.N.H.1988). There I said that the closer the transaction gets to the heart of the reorganization process, the more scrutiny the Court has to give that matter. Specifically, in *In re PSNH*, I refused to allow the debtor to transfer management and operation of a nuclear power plant to a separate corporation. In so doing, I said you must analyze a major transaction to see

> ... whether the proposed transaction might improperly and indirectly lock the estate into any particular plan mode prematurely, and without the protection afforded by the procedures surrounding a disclosure statement and confirmation hearing, in a plan of reorganization.

*In re PSNH*, 90 B.R. 575, 581–82 (Bankr. D.N.H.1988).

I do not think the scheduled three-day trial on these motions is adequate to protect the creditors and the other interests involved. Rather, the transactions proposed in those motions should properly be examined in the disclosure statement and confirmation processes. This is how Congress intended to deal with bankruptcy entities proposing major restructuring, and I must respect that decision.

A secondary problem is that a question of subject-matter jurisdiction has been raised due to the involvement of FERC on some aspects of these matters. I believe

this question is best resolved in the confirmation process because then the issue is squarely joined between two federal statutes as to how each would be fully implemented, or if they conflict, how each can be as fully implemented as possible without destroying the other. I'm ready to do that, and I think a decision made in that context would be better considered and have much more weight than were I to reach that issue in this procedural posture.

The jurisdictional issue also involves rather sophisticated questions about what is a "contract issue" and what is a "rate issue" that I don't know that I'm in any posture to rule upon very quickly in any event, and if I don't rule on jurisdiction promptly, there is no way we can get to the scheduled September 23rd hearings on the pending motions without this sword of Damocles hanging over everybody's head discouraging the maximum effort that would be required to even attempt to litigate fully the substantive questions involved at that time.

### CONCLUSION

Debtor's Motions to Change Power Supply must be denied without prejudice to their being presented in a plan subject to the disclosure statement and confirmation process. That is the procedure Congress intended for such a major restructuring of a debtor's affairs to occur.